## PEOPLE vs. WHITHURST.

*Fourth District Court for San Francisco Co., Feb. T.,* 1858.

REASONABLE DOUBT—TESTIMONY—MEDICAL AND SURGICAL TREATMENT.

By reasonable doubt is not meant a mere suspicion that the defendant may be innocent or guilty, or that any theory of the prosecution or defense may be correct; the question is, rather, after a full consideration of the whole testimony, is the understanding directed, the judgment convinced, so that the mind has arrived at a conclusion ; or do such doubts exist that the mind remains unsatisfied.

Malice aforethought, and malice express and implied, defined.

The credit of witnesses may be impeached by a cross examination ; by disproving their statements by other witnesses ; by general evidence affecting character for morality, truth, and veracity; and by proof that the witnesses have made statements contrary to those testified to, in regard to matters relevant to the issue.

If testimony is conflicting and irreconcilable, a jury may adopt or reject any portion of it, and ascertain the facts according to the reasonable probabilities of truth, or as the preponderance of the testimony may indicate, or convince the judgment.

If death is occasioned by grossly erroneous medical or surgical treatment, and not by the wound itself, the defendant is not answerable ; but if it results merely from a want of the higher professional skill which is obtainable in populous cities, but not accessible where deceased was treated, the defendant, for that reason, is not excused or held innocent.

If the operation of *trephining* was required for the proper treatment of the deceased, and it was performed with ordinary skill, and death ensued. as a direct or indirect consequence, the defendant is not released from responsibility.

If it was known that the operation would give a chance of saving life, and it had not been performed, it might have been contended in defense that deceased died from the incompetency or neglect of his medical attendants.

If, during any necessary remedial treatment or operation, unforseen and usual causes cut short life, no exculpation should be admissible to attack the best directed efforts for the preservation of life.

If an operation is unnecessarily performed, the responsibility of the defendant would cease, if the death could be clearly ascribed to it; but if it be necessary, and be performed with proper skill, and some other resulting disease destroys life, the defendant would be differently situated.

If doctors learned in medicine and surgery, disagree as to the treatment and remedy, a uniform rule cannot be adopted by the practitioner that all would pronounce proper; but he will probably be condemned by the one school opposed to, and supported by the other, favoring it. In such case it is not a question whether medical skill might have saved life, or whether the surgeon did or did not pursue the proper remedy; but what was the cause of death, and were available and proper means used to preserve life.

This was an indictment found against *Marion Whithurst*, as principal, and *William Roberts* and *Charles Bearss*, as accessories, charging them with them urder of one *A. A. Mason*, at the town of Michigan Bluffs, Placer county. The case was transferred for trial to San Francisco city and county. The defendants pleaded not guilty, and demanded separate trials.

On the 12th of May, 1857, deceased received a blow on the forward part of the left side of his head, which was charged to have been inflicted by defendant, *Whithurst*, with the barrel of a pistol, and that the other defendants aided and assisted. On the day following the blow, *coma*, and compression of the brain ensued, and the operation of *trephining* was performed. The deceased lingered, without change for the better, until the 20th of the same month, when he died. A great deal of testimony was introduced which it is unnecessary to state, inasmuch as but little more of the charge is given, than such portions as present the questions of medical jurisprudence, and as refer to the surgical and medical treatment. The facts relating to these questions are sufficiently stated in the extract given from the charge of the court.

The issues raised on the part of the defendant were, first, as to the fact, of whether deceased came to his death from a blow inflicted by *Whithurst*, or one of the accessories—and second, whether the death was caused by the blow, or by insufficient and unskillful medical treatment.

*Thomas* and *Nunes*, for the prosecution.

*M. S. Latham, S. Heydenfeldt,* and *M. E. Mills*, for prisoner.

HAGER, J., charged the jury.—The prisoner at the bar, *Marion*

*Whithurst*, together with *William Roberts* and *Charles Bearss*, stand charged with the murder of *A. A. Mason*, as is contained in the indictment which has been read to you.

To this indictment the prisoner has pleaded not guilty, and demanded a separate trial.

The issue thus formed, whether or not the defendant, is guilty of the offense charged against him, or of any offense which is necessarily included in that with which he is charged in the indictment, you have been impanneled as a jury to try and determine by your verdict.

It is my duty to declare to you such matters of law as I may think pertinent to the issue, and necessary for your information; and although I may state the testimony, it is exclusively your province to consider it, and find the facts as disclosed. In other words, it is your duty to receive the law as declared by the court—but in regard to the facts and evidence, you must be governed by your own recollections and conclusions.

The indictment substantially charges the defendant, *Whithurst*, as principal, and *Roberts* and *Bearss* as accessories before the fact; that is, before the homicide was perpetrated.

Should you then find that a homicide has taken place as charged, and that *Roberts* and *Bearss*, or either of them, aided, abetted, or assisted, advised or encouraged in committing it, this fact might possibly render them all guilty of the homicide, but will not, of itself, excuse *Whithurst*, the defendant; that is, if you should come to the conclusion that *Roberts* and *Bearss*, or either of them, aided, abetted, or assisted, in committing the homicide, for instance, by throwing plates at deceased, the prisoner here on trial should not, for that reason, be acquitted.

You are at liberty, if the evidence will justify it, to find this defendant guilty or not guilty, whether *Roberts* and *Bearss*, or either, be guilty or not guilty.

If you come to the conclusion that deceased came to his death from the immediate effect of a wound inflicted with a pistol, by the defendant, then he must be guilty, either of—

Murder of the first degree;

Murder of the second degree ;

Manslaughter ; or,

Justifiable or excusable homicide.

[The court then proceeded to state at length how these are respectively defined by the statute law of this state, and to explain the distinction between murder and manslaughter.]

The court then charged :

In a criminal action the defendant is presumed to be innocent until the contrary be proved. And in case of a reasonable doubt whether his guilt be satisfactorily shown, he is entitled to be acquitted ; but if the killing be proved to have been committed by the defendant, then the burthen of proving circumstances of mitigation, or that justify or excuse the homicide, devolves on the defendant, unless the proof on the part of the prosecution sufficiently manifests that the crime committed only amounts to manslaughter ; or that the defendant was justified or excused in committing the homicide.

By reasonable doubt is not meant a mere suspicion that the defendant may be innocent or guilty, or that any theory of the defense or prosecution may be correct, but a reasonable doubt of the defendant's guilt, after considering the whole testimony.

The question is, rather, is the understanding directed, the judgment convinced ? Have you come to a conclusion in your own mind as to the guilt or innocence of the defendant ? or is there, after a review of of the whole testimony, a reasonable doubt, and the judgment remains unsatisfied ?

The defendant is entitled to the benefits of such reasonable doubts, if they exist.

Malice aforethought, according to its legal meaning, is not confined to murders committed in cold blood, with settled determination and premeditation, but extends to all cases of homicide, however sudden the occasion, where the act is done with such cruel circumstances as are the ordinary indications of a wicked, depraved, and abandoned heart; as where the punishment inflicted by a party is without provocation, or even if upon some provocation, it is outrageous in its nature and continuance, and beyond all proportion to the offense, so that it is

rather to be attributed to malignity and brutality, than to human infirmity.

Express malice is the deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances, capable of proof.

Malice is implied when no considerable provocation appears, or where all the circumstances of the killing show an abandoned and malignant heart.

The malice necessary to constitute the crime of murder is not confined to the intention to take away the life of a person, or to spite, malevolence, or revenge, which may be manifested by external acts and declarations, but also includes an intent to do an unlawful act, which may probably end in depriving a person of life.

It may be proper, in this connection, to declare to you some of the ordinary rules applicable to witnesses and testimony.

It is for you to decide what credit you will give to the testimony of witnesses. It is your province to arrive at the truth, and in order to do this you may credit or discredit testimony as your judgment of its value, and your estimation of the witnesses, may dictate.

The credit of witnesses may also be impeached. This is ordinarily done, or attempted to be done, by a cross examination of the witnesses; by disproving their statements by other witnesses; by general evidence affecting character for morality, truth, and veracity; and also by proof that the witness has made statements out of court contrary to what has been testified to at the trial, in regard to matters relevant to the issue. Whether or not in this action the credit of any witness has been successfully impeached or contradicted, or whether the whole or any portion of the testimony of any witness should be discredited, it is for you to determine.

If you find the testimony conflicting and irreconcilable, you may, if you feel so disposed, in arriving at a conclusion either for or against the prisoner, adopt or reject any portion of it, and ascertain the facts according to the reasonable probabilities of truth, or as the preponderance or weight of the testimony may indicate and convince your judgment. Neither are you confined to the positive or direct proof in arriving at a

conclusion; a jury may, in any case, *infer* or *presume* guilt or innocence from circumstantial evidence alone; and in arriving at a verdict you are at liberty to take into consideration any circumstances given in evidence either for or against the prisoner.

[The court here stated the testimony as introduced on the part of the people and the defendant, which is omitted, and then proceeded as follows.]

If you should come to the conclusion that the defendant, with a pistol inflicted the blow on the forward part of the left side of the head, which has been described by the physicians as the dangerous wound—then a still more important question remains for you to determine : was it mortal—or rather, did deceased die from the effects of that wound ?

It is testified that soon after deceased received the wound, and during the same night, it was several times examined by the attending and consulting physicians and surgeons, and a slight indentation or depression of the skull, immediately under the external injury to the scalp, was detected; that subsequently, during the same night and next day, the symptoms indicated that compression of the brain had supervened, and deceased was laboring under its effects; that four physicians and surgeons were in attendance on the morning (May 13th) after the wound was given—Drs. *Waters*, *Nobles*, *Favor*, and *Lilly*—and they all agreed compression of the brain existed, and that the operation of *trepanning*, or *trephining*, as it is termed, was a necessary and proper remedy to be resorted to. This operation was performed by removing with an instrument called a *trephine*, a piece of the bone of the skull immediately beneath the seat of the injury, when it was discovered there was extravasated blood lying upon the outer membrane of the brain, which extended over a portion of, and below the orifice made by the instrument, and an indentation and fissure upon the piece removed, which was apparent to the eye. That after the operation deceased lingered until the 20th of May, following, when he died. A *post mortem* examination was then made of the entire skull, (which has also been produced on the trial,) and, as testified by the surgeons, it contained a fissure, or fracture, commencing at the place of the injury, running in two branches—one over the forehead, the other by the left side

of the head—down into the inner portions, and extending to the base of the skull, under which several ounces of *coagulum* was found.

Now, upon this branch of the case—as to the nature and effect of the wound itself, the skill of the operating surgeons, and the propriety of the medical and surgical treatment of the patient—there has been a great deal of testimony given by the attending physicians and surgeons, and others called as experts, and also reference has been made to the writings of many persons eminent, and of standard authority, in these professions, from which it appears there is much diversity of opinion.

Some of the witnesses have testified that the wound itself was necessarily mortal; others that it was dangerous, with small chance of life; and again others that it was not necessarily fatal, or even dangerous. Some of the witnesses and authorities recommend and support the operation of *trephining*, others condemn it. I am, therefore, unable to announce to you any general certain rule of practice, as established by the testimony, or the authorities cited by the witnesses and counsel, by which the character of this wound, or its skillful treatment, can be tested. If *trephining* had not been resorted to, a medical remedy would have been omitted which some of the witnesses testify was proper and advisable.

It is also a difficult matter for me to announce any general and applicable rule of law for your guide, but I will instruct you; that if you should find that the death was occasioned by grossly erroneous medical or surgical treatment, and not by the wound itself, the defendant is not answerable; but if it was occasioned merely for the want of the higher professional skill and treatment which is obtainable in the more populous cities and towns, but was not accessible in the remote section of the country where the deceased resided and was treated, the defendent is not, for that reason, to be excused and held innocent of any public offense.

If the operation was required for the proper treatment of the patient and wound, and it was performed with ordinary skill, and still death ensued as a direct or indirect consequence, the prisoner is not released from responsibility. If the surgeons knew that the operation would

give a chance of saving life, and had not performed it, it might have been contended in defense that deceased died, not from the wounds, but from the incompetency and neglect of his medical attendants. If, during any necessary remedial treatment, or operation, unforseen and usual causes cut short life, no exculpation should be admissible to attack the best directed efforts, properly made, for the preservation of life.

Should, however, an operation be unnecessarily performed, the responsibility of the prisoner would cease, if the death of the wounded party could be clearly ascribed to it. Thus, to illustrate my meaning, if bleeding is a necessary remedial treatment for an injury, and in performing it the surgeon wounds an artery, or in case of necessary amputation an artery be imperfectly secured, so that the patient in either case dies from hemorrhage, the prisoner would not be responsible, because it would be punishing him for an event depending on the unskillfulness of the medical practitioner. But if the bleeding or amputation be necessary, and be performed with all proper skill, and yet *tetanus*, gangrene, or fever, results, and destroys life, the prisoner might be differently situated.

It may in this connection be stated, that Doctors *Waters*, *Nobles*, and *Favor* considered the wound mortal.

Dr. *Favor*, who was sworn for the defense, says that in his opinion, death would certainly have resulted from the wound, operation or no operation.

Now if you find that the wound itself was mortal, and caused the death, it is hardly necessary to give any extended consideration to the medical treatment and remedies. If, however, you do not so find, then the question may become important for you to determine, whether the death is attributable to the wound itself, or to unnecessary and unskillful treatment of the physicians. And in this connection you should remember, if doctors, learned in medicine and surgery, disagree as to the particular treatment and remedy to be prescribed, a uniform rule cannot be adopted by the practitioner that all would support and pronounce proper. But he will probably be condemned by the one school opposed to, and supported by the other, favoring it.

24

You must recollect, however, the question presented to you is not whether medical skill could have saved the life of deceased, nor whether the attending physicians did or did not pursue the proper remedy; but what was the cause of death? and were available and proper means resorted to for the preservation of life?

If you should find that the wound and fracture on the left side of the head was the direct cause of the death, and that the prisoner gave and inflicted them, the next matter for you to determine is, the facts and circumstances of the killing; or rather, whether the prisoner has committed a public offense.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

In determining what, or if any offense has been committed, you will recollect and be governed by the principles of law which I have heretofore announced to you, applicable to these questions.

The evidence is before you, and it is for you to consider it and decide upon the important issues submitted for your consideration and reflection.

Your verdict, if general, should be either guilty or not guilty.

If the prisoner is neither guilty of murder in the first nor second degree, nor of manslaughter, your verdict should be not guilty.

If your verdict should be guilty, you must specify the degree of guilt, or rather the particular grade of crime.

If you should come to the conclusion that the prisoner unlawfully killed the deceased, and that the killing was willful, deliberate, and premeditated, you may, by your verdict, find him guilty of murder in the first degree.

If you should come to the conclusion that the prisoner, with malice either express or implied, unlawfully killed the deceased, but that the act was not willful, or was without deliberation or premeditation, you may find him guilty of murder in the second degree.

If you should come to the conclusion the killing was unlawful, but without malice express or implied, and without any mixture of deliberation, you may find the defendant guilty of manslaughter.

The court made some further concluding remarks, which involve no principles of law, and submitted the case to the jury.

The jury rendered a verdict, guilty of murder of the second degree.